**WOODY et al.**

v.

**STATE CORP. COMMISSION.**

Nos. 35684, 35821.

Supreme Court of Oklahoma.

Jan. 19, 1954.

Coleman Hayes, Monnet, Hayes & Bullis, Oklahoma City, for plaintiff in error.

V. P. Crowe, Val R. Miller, Embry, Johnson, Crowe, Tolbert & Boxley, Oklahoma City, for defendants in error United Carbon Co., Union Producing Co. and Decem Drilling Co.

S. L. Simpkins, Elk City, for Mineral Holders Ass'n, Great Elk City Field.

George W. Cunningham, Mark D. Dunlop, Tulsa, for defendant in error Shell Oil Co.

O'NEAL, Justice.

The appeal to this court is taken by E. M. Woody, and other royalty owners, from an order of the Corporation Commission dated June 28, 1952, and of September 26, 1952, adjudicating the ratification of the former order. The two cases, 35,684 and 35,821, have been consolidated in this court for briefing and decision.

The appeal assails the Corporation Commission's Order No. 26021 as not sustained by substantial evidence, and on the further ground that the order which provides for the allocation of unit production under the 50/50 formula deprives appellants of their property without due process of law, and in violation of the Fourteenth Amendment to the Constitution of the United States and of Art. II, § 7 of the Constitution of the State of Oklahoma.

An epitome of the findings of the Commission follows:

"2. That on October 27, 1950, by Order No. 24158, the original unit was created, and that on the 29th day of January, 1951, by Order No. 24402, a plan of unitization for the first enlargement of the unit was approved effective February 1, 1951.

"3. That the area of the proposed new unit is underlaid by a common source of supply.

"4. That the requirements of the statute with respect to the necessity of unitized management, etc., exist.

"5. That the size and shape of the proposed unit area are reasonably required for efficient conduct of unitized methods of operation.

"6. That all of the plans submitted in connection with the enlargement of the unit are similar in all respects except with respect to the distribution of unit production. That all plans contemplated that the allocation formula take

into account (a) an acreage or well factor, and (b) saturated hydrocarbon pore space with weights varying from 10 per cent to 50 per cent for acreage and from 50 per cent to 90 per cent for hydrocarbon pore space. That in the original plan 50 per cent weight was given to acres or wells and 50 per cent to the tract's percentage of effective hydrocarbon pore space. The Commission further found, 'There has not been any sufficient showing of change of conditions in the Elk City Field, either in the area originally unitized or in the area now proposed to be unitized which, in the opinion of the Commission, justifies the Commission in changing from the formula for division of unit participation adopted in the original and one enlarged Elk City Unit.'

"7. '* * * that it would now be manifestly unfair to change the formula and adopt a different participation formula for the creation of an enlarged unit; that the oil industry has the right to expect this Commission to be consistent and to continue to use the same formula in the enlargements of units unless it is shown that the formula previously used was manifestly unfair or that conditions have arisen which could not have been foreseen or anticipated at the time the original suit was created.'

"8. The Commission further finds that the so-called 50-50 formula is the most fair and equitable formula for a distribution of unit participation among the several tracts which was suggested or considered and takes into account all of the factors which the statute says should be included in arriving at a formula for the distribution of unit participation among the several tracts therein.

"9. That the adoption of a formula other than the 50/50 would tend to retard the development of the undeveloped portion of the field and thus cause recoverable oil and gas to be left in the ground, and that the adoption of the 50/50 formula will prevent or tend to prevent waste.

"10. That the only objections to the creation of an enlarged unit involved the participation formula.

"11. That the unit should include the lands described.

"12. That the unit area is underlaid by a common source of supply.

"13. That the plan of unitization attached to Shell's petition should be approved except that unit production should be distributed among the several tracts 'by the same formula which was used in computing the participation in the original Elk City Unit, giving each tract a one-half credit for its effective hydrocarbon pore space and a one-half credit for its wells or acreage.'

"That subject only to the modification hereinafter set forth, the Plan of Unitization which is attached to the petition filed herein, and which is made a part hereof by this reference, is suited to the needs and requirements of the Elk City Hoxbar Sand-Conglomerate Unit; that said Plan of Unitization is fair, reasonable and equitable and will protect, safeguard and adjust the respective rights and obligations of the several persons affected, including royalty owners, * * *.

"14. That the petition and plan of unitization comply with the requirements of Senate Bill 203 of the 1951 Legislature.

"15. That jurisdiction should be retained in order to determine when the consent of the required percentage of lessees and mineral owners has been obtained."

The formal order of the Corporation Commission entered on the 28th day of June, 1952, is based upon and is in conformity with the foregoing findings of the Commission.

The law as applied to unitized management of common sources of supply is governed by Senate Bill 203 of the 1951 Legislature, Title 52 O.S.1951 §§ 287.1 to 287.-15 to the applicable provisions of which we shall advert, infra.

A comparison of the foregoing Act with the Unitization Act of 1945, House Bill 339

of the 1945 Legislature, Tit. 52 O.S.Supp. 1947 §§ 286.1 to 286.17 discloses that they are comparable in their material provisions. Under the Act of 1945, the oil and gas lessees were the sole arbiters to authorize and provide for unitization management, operation and development of oil and gas properties to which the Act was applicable, while under the present Act (1951) here involved, royalty owners, as well as the lease owners, must approve the Unitization agreement prior to the Commission's order establishing the same. The constitutionality of the former (1945 Act) has been upheld by this court in the following cases: Palmer Oil Corp. v. Phillips Petroleum Co., 204 Okl. 543, 231 P.2d 997, certiorari denied, Palmer Oil Corp. v. Amerada Petroleum Corp., 343 U.S. 390, 72 S.Ct. 842, 96 L.Ed. 1022; Spiers v. Magnolia Petroleum Co., 206 Okl. 503, 244 P.2d 843.

In the Palmer case the minority of the court were of the view that "much less should it be necessary for the State to authorize a majority group of lessees to take over the operations of other lessees, to the objection and detriment of minority lessees, and over the objection of *all* royalty owners." [204 Okl. 543, 231 P.2d 1020.] These objections have been removed by the repeal of the 1945 Unitization Act and the substitution of the 1951 Unitization Act, which latter Act requires notice to and approval of the unitization agreement by royalty owners, as well as lessee owners.

Appellants, as we have noted, make the contention that the order as applied to them is unconstitutional and deprives them of their property without due process of law, and further that the order is contrary to the undisputed evidence and is palpably inequitable and unfair. Whether the latter contention is well taken necessitates our examination of a record of 1700 pages of testimony taken by the Commission in its hearing covering a period of nine days.

■ We are of the view that the Unitization Act of 1951 requiring notice to and consent of royalty owners on a comparable basis with lease owners have placed the Act beyond any challenge on constitutional grounds.

■ This court has held that the Legislature may curtail individual freedom in the public interest, and where the Legislature has made its choice as to the method and manner of the control, its choice is not subject to restraint, unless its application and enforcement impinges upon constitutional guarantees. Neither has the court the power or authority to resolve its doubts, whether the remedy adopted is as efficacious as many believe, or is not as good as some other plan or scheme suggested, or is better even than the blind operation of uncontrolled economic forces. Our duty ceases when we draw a line somewhere between opposing and conflicting abstract principles. Our duty is to decide—not to debate.

The proceeding before the Commission which was designated: "In the Matter of the Petition of Shell Oil Company and Others for the Enlargement of the Unit Area of the Elk City Hoxbar Sand-Conglomerate Unit by Unitizing the Unit Area of said Unit with Adjoining Portions of the Hoxbar Sand-Conglomerate Common Source of Supply of Oil and Gas under a portion of the Elk City Field located in Washita and Beckham Counties, Oklahoma, pursuant to the provisions of Senate Bill No. 203 of the 1951 Session of the Oklahoma Legislature" was filed with the Corporation Commission on December 20, 1951.

The record shows that the Elk City field was discovered in the fall of 1947. The first unitization unit established by the Commission's order consisted of 81 developed forty-acre tracts. The unit was thereafter enlarged by an addition of 106 forty-acre tracts, each tract having a producing well thereon. The present application seeks to add additional acreage and 201 producing wells to the previously established unit. Under the plan of unitization the entire area will be operated by a representative selected by the owners of the separate interest in the oil and gas rights. The plan, among other features, contemplates a recycling and pressure maintenance program, which all parties agree will result in the recovery of a greater number of barrels of oil, gas and gas distillate over and above what would be produced in the absence of unitization. It is further asserted, and not

controverted, that the gas energy in the pool will be thus conserved, resulting in a more economical production of the oil.

All interested parties agree that the present application for an extension of the pre-existing unit should be granted. The contest or controversy relates solely to the merits of the various plans for the distribution of the unit production in the entire area of the field.

Upon the final hearing the Corporation Commission found that the requisite number of lessees and royalty owners had, in writing, approved and ratified the plan of unitization. Upon an acreage basis 67% of the royalty owners and 97% of the lessees within the enlarged unit area have ratified the unitization agreement, and the 50/50 formula approved by the Commission.

As we have indicated, the basic issue is whether the order of the Commission is supported by substantial evidence. If so, the order must be affirmed. If not, it must be set aside. In the orderly administration of law we must indulge the presumption that the Commission's order is just, reasonable, and correct. Grison Oil Corporation v. Corporation Commission, 186 Okl. 548, 99 P.2d 134.

Our appellate jurisdiction, as applied to the case before us, is judicial only, and is limited to a consideration whether the Commission has legally pursued its authority, and whether its findings and conclusions are sustained by the law and substantial evidence. Art. IX, § 20, Constitution of the State of Oklahoma. Under this mandate an order of the Commission when appealed to this court will be affirmed if it is supported by substantial evidence. Spiers v. Magnolia Petroleum Co., 206 Okl. 503, 244 P.2d 843. Neither are we required to weigh and measure the evidence in an endeavor to determine its preponderance. Our duty ends with a finding that there is evidence of a probative value reasonably and substantially sustaining the Commission's findings and order. Yellow Transit Co. v. State, 198 Okl. 229, 178 P.2d 83.

As we have noted, the Commission had by its former order established a 50/50 formula as applied to this oil field. Under this formula 50% of the unit production was allocated on an acreage basis and 50% on the basis of saturated hydrocarbon pore space. Under the present application it was sought to apply the 50/50 formula to the extended area with 201 producing wells thereon. Certain lessees proposed that a new formula be adopted for the proposed extension with the proceeds of production being divided as follows: 30% on the basis of acreage and 70% on the basis of saturated hydrocarbon pore space. Wilcox proposed that the 70–30 formula apply to the entire unit. Mr. Woody, the appellant, and other royalty owners joined in the Wilcox formula.

The Shell Oil Company with substantial production in the field advocated a 70–30 formula, 70% being allocated to saturated hydrocarbon pore space, and 30% weight to be allocated to acreage. A group of royalty owners sought the adoption of a 90–10 formula, 90% to saturated hydrocarbon pore space and 10% on an acreage basis. The United Carbon Company and associates requested the Commission to extend the unit and to apply to it, as well as to the entire unit, the 50/50 formula. Other formulas and plans were suggested during the progress of the hearing before the Commission.

A great volume of the testimony is of a highly technical character. In this connection appellants suggest that the evidence is highly speculative, conjectural and of questionable probative value. We do not agree.

We find direct evidence of geologists and petroleum engineers who had been intimately associated with the Elk City field from its first production in 1947, to the time of the hearing before the Commission. They testified that they had examined numerous electric logs and many micrologs that had been run, examined core analysis from the wells, and considered drill stem tests taken in the field, as well as volume production from the wells. From the study so made they were of the opinion that the formations in the field were highly erratic; that there were rapid variations in the thickness of the pay zones, as well as the

porosity and permeability of the producing zones; they found greater variations in permeability than in porosity of the sand zones and concluded that the degree of permeability is vitally important to the capacity of a well to produce. There seems to be conformity of opinion among these witnesses that the factor of acreage and saturated hydrocarbon pore space should be considered in any formula adopted. Their testimony indicates that their reference to acreage under each well was in fact a consideration of each well's ability to produce upon its forty-acre tract allotment; they all agreed that the estimated pay thicknesses throughout the field were highly variable from well to well and zone to zone, and that vertical distribution of both permeability and porosity were highly variable in every zone. Some wells had less than 35 feet of pay, others as high as 200 feet of pay thickness; that there were good and bad producing thick wells and good and bad producing thin wells. In addition to the evidence of the so-called "expert witnesses" the Commission had the benefit of testimony from a great number of lay witnesses.

Concededly, appellants' witness, Mr. Foley, a geologist and petroleum engineer, did not agree with the other geologists and petroleum engineers that a 50/50 formula should be applied. He urged the adoption of a 90/10 formula. Neither did geologist Copeland, called by Shell, agree that the 50/50 formula was the best yardstick to employ as the basis for the distribution of the production. He advocated a 70/30 formula. Mr. Foley's opinion was that in any unitization case the oil should be divided on the basis of 100% saturated hydrocarbon pore space, and that such a division would be the most equitable. As we view it, Mr. Foley's position fails to take into consideration the provision of the Unitization Act which requires the Commission to take into consideration the probable productivity in the absence of unitization, position on structure and the other factors enumerated in the Act, other than oil and gas in place.

This Act provides that the Commission take into consideration the following:

"* * * acreage, the quantity of oil and gas recoverable therefrom, location on structure, its probable productivity of oil and gas in the absence of unit operations, the burden of operation to which the tract will or is likely to be subjected, or so many of said factors, or such other pertinent engineering, geological, or operating factors, as may be reasonably susceptible of determination." 52 O.S.1951 § 287.4.

Although striking a fair balance involves incalculable variants, and therefore is beset with perplexities, nevertheless, we are of the view that the findings of the Commission that the wells on the enlarged area produce oil and gas and gas distillate from the common source of supply, and that the enlarged area is reasonably necessary to carry on effectively cycling operations, pressure maintenance and repressuring operations, and that these operations will prevent waste and will result in the recovery of substantially more oil and gas and gas distillates from the common source of supply than would otherwise be recovered; and that the formula 50/50 for the distribution of the production therefrom is fair and equitable, is sustained by substantial evidence, and that said findings and the order made in support thereof as here applied does not deprive appellants of any constitutional guarantees.

The order of the Commission is therefore affirmed.

HALLEY, C. J., JOHNSON, V. C. J., and WELCH, DAVISON, WILLIAMS and BLACKBIRD, JJ., concur.