**JONES OIL COMPANY and Trevlyn Oil Company, Plaintiffs in Error,**

v.

**CORPORATION COMMISSION of Oklahoma et al., Defendants in Error.**

No. 40015.

Supreme Court of Oklahoma.

May 14, 1963.

Rehearing Denied June 18, 1963.

752

Barth P. Walker, Walker & George, Oklahoma City, for plaintiffs in error.

Ferrill H. Rogers, Oklahoma City, for Corporation Commission.

Fisher Ames, Oklahoma City, for Texaco, Inc.

Cecil Hamilton, Oklahoma City, for Phillips Petroleum Co.

Gordon Watts, Oklahoma City, for Shell Oil Co.

Robert A. Hefner, Jr., Oklahoma City, for the Hefner Co.

Francis Irvine, Oklahoma City, for Kerr-McGee Oil Industries, Inc.

R. A. Huffman, Lupardus, Holliman & Huffman, Tulsa, for Schermerhorn Oil Corp.

Roberts W. Richards, Oklahoma City, C. B. Wallace, Ross Madole, Dallas, Tex., of counsel, for Socony Mobil Oil Co., Inc.

HALLEY, Vice Chief Justice.

On January 10, 1962, the Corporation Commission of Oklahoma entered Order No. 47677 in cause CD No. 15732 before it and approved the creation of the Tatums Field Unit in Stephens County. The applicants were Socony Mobil Oil Company, Inc., Texaco, Inc., Phillips Petroleum Company, Shell Oil Company, The Hefner Company, Kerr-McGee Oil Industries, Inc., Schermerhorn Oil Corporation. Jones Oil Company and Trevlyn Oil Company protested the approval of the application and have appealed the denial of their protest and the creation of the Unit.

The Corporation Commission was proceeding under 52 O.S.1961 §§ 287.1–287.15, The "Unitization Act."

There was a full hearing of the application by the Corporation Commission. It appears from the record that approximately four years prior to this hearing the majority of oil and gas operators in the Tatums Field began the study of secondary recovery possibilities of this area which has been designated as the Tatums Field Unit. A total of 275 presently producing oil wells were drilled therein.

There were three producing sands in the area, Tatums, Stray and Pennington. Tatums was the greatest producer, Pennington next and then Stray. 61 wells produced in two or three sands. They are all three found in the Unit area.

It is estimated that 22,500,000 barrels of oil will be recovered by the secondary recovery operations.

The Unit area covers 3663 acres. Trevlyn Oil Company and Jones Oil Company, the protestants, owned leases covering only 150 acres or 4.7619 per cent of the Unit area. When the Plan of Unitization was circulated 83.3358 per cent of the lessees and 72.51116 per cent of the royalty owners approved the same. This is in excess of statutory requirements. 52 O.S.1961 § 287.5.

The protestants raise seven Points as to the validity of Order No. 47677 and the Plan of Compulsory Unitization approved by it. We will discuss them in order.

■ The first Point made is that the three oil producing sands that underlie the Unit areas, the Tatums, Stray and Pennington, are not a common source of supply but in fact three common sources of supply and for that reason cannot be joined in one unitization plan. With this contention we cannot agree. The fact remains that oil is being produced from these three sands through the same well-bore. The evidence clearly shows that it would be uneconomical to make three separate units of these sands. To us it would violate the very reasons for unitization as set out in the first section of the Unitization Act passed in 1951, which is 52 O.S.1961 § 287.1, and is as follows:

"The Legislature finds and determines that it is desirable and necessary,

under the circumstances and for the purposes hereinafter set out, to authorize and provide for unitized management, operation and further development of the oil and gas properties to which this Act is applicable, to the end that a greater ultimate recovery of oil and gas may be had therefrom, waste prevented, and the correlative rights of the owners in a fuller and more beneficial enjoyment of the oil and gas rights, protected."

We can see nothing wrong in the Corporation Commission designating these three sands as a common source of supply as they did in Order No. 44384 on December 30, 1960, the 4th and 5th paragraphs of which are as follows:

"4. That since 1937 the wells on the above described lands, which were completed in two or more of said sands, have been operated as producing from one common source of supply and the production from all sands has been commingled in the well bore; that at the present time there are 61 such wells completed in and producing from two or more of said sands; that none of said wells were completed in such a manner that each sand is produced separately; that by reason of such commingling over this period of time said sands for all practical purposes and intents at this time constitute one common source of supply underlying the aforesaid lands; that it is not now economically feasible to separately produce each of said sands; that the said sands have the same general lithogical characteristics and the pressure in each of said sands is substantially the same; "that the Tatums, Stray and Pennington sands underlying the above described lands constitute one common source of supply; that in the event secondary operations should be deemed feasible it would be both impracticable and uneconomical to separately operate and produce each of said sands.

"5. That in the interest of securing the greatest ultimate recovery of oil or gas from the aforesaid Tatums, Stray and Pennington Sands, the prevention of waste therein, and the protection of correlative rights, this application should be granted."

For us to hold otherwise on this Point would violate the spirit of unitization. Protestants' Point I cannot be sustained.

■■ Protestants' Points II and III are argued together and are as follows:

## "II

"Order No. 47677, and the Plan of Compulsory Unitization approved by it, violates the limitations placed on the Commission by Title 52, Sec. 287.4, O.S., 1961, in that the division of interest or formula for apportionment and allocation of the unit production, among and to the separately owned tracts within the Unit Area, all as approved by said Order and Plan, fails to apportion or allocate to such tracts that portion of the unit production as will reasonably permit persons otherwise to share in or benefit by such production, to produce, or receive in lieu thereof, their fair, reasonable and equitable share of the Unit production or other benefits thereof."

## "III

"Order No. 47677, and the Plan of Compulsory Unitization approved by it, violates the limitations placed on the Commission by Title 52, Sec. 287.4, O.S., 1961, in that the share of unit production allocated and apportioned to each separately owned tract by said Order and Plan is not the fair, equitable and reasonable share of unit production required by such statute and the share of unit production allocated and apportioned to each such tract is not measured by the value of each such tract for oil and gas purposes, and the contributing value of each such to the Unit in relation to like values of other tracts in the Unit, and does not take

into account the factors which said statute requires."

We cannot agree that the Order and Plan of Unitization fails in the respects mentioned in Point II. Neither can we say that the Order and Plan violates the limitations placed on the Commission by Statute.

The Plan of Unitization as approved by the Corporation Commission sets out the tract participation expressed in per cent of unit production as that participation is assigned to each of the several separately owned tracts in the Unit area. The method was set out in protestants' brief as follows:

"* * * The tract participations in unit production were calculated from two formulae—one called the 'primary production formula', and the other the 'secondary recovery formula.'

"The primary production formula is based upon 'current production' during the base period, July 1, 1959 through December 31, 1959. A separately owned tract's participation in primary unit production based on this formula is a percentage derived at by dividing an individual separately owned tract's cumulative production for the period before stated by the unit area cumulative production for the same period. This formula remains in full force and effect under the plan until, from and after January 1, 1960, a total of 7,600,-000 barrels, the estimated total future primary oil has been produced.

"On the first month following the month in which the 7,600,000 barrels of estimated future primary oil has been produced, then the 'secondary recovery formula' becomes effective. This formula would allocate unit production among and to the separately owned tracts on the basis of net acre feet of productive sand under each tract. In other words, the total net acre feet in all of the sands estimated to be included within the unit boundary as shown by R. Ex. 19, 20 and 21 is the denominator of a fraction whose numerator is the amount of net effective sand under each separately owned tract. The total secondary unit production is then allocated upon the basis of the decimal fraction obtained from this relationship. The total participating sand volume in acre feet from all of the sands is 139,417.5 acre feet.

"The Tatums Sand contains 126,900 acre feet, or 91.02% of the total; the Stray Sand contains 3,402.5 feet or 2.44% of the total; and the Pennington Sand contains 9,115 acre feet, or 6.54% of the total."

We are of the opinion that there is nothing wrong with the formulas used. Certainly the base period, July 1, 1959, to December 31, 1959, was fair to all.

It would seem that the protestants think they have been treated unfairly because their wells on the Trevlyn Mitchell lease have produced so abundantly that they should have been given a greater percentage on both the future primary recovery and also the secondary recovery. The expert witness for the applicants very clearly showed there was no discrimination against protestants. We quote his testimony on this point as follows:

"The basis for allocating ownership among the various tracts within the Unit Area was keyed to what is known as a split formula. The remaining primary reserves were allocated on the basis of choosing, well, first, on the basis of determining by decline curve extrapolation the total remaining primary reserves to an economic limit of one point six eight barrels per day per well, the remaining primary reserves for the entire Unit Area, including all commingled sands. This was done on a decline curve basis, agreed and calculated from an Engineering Committee and recommended to the operators for their acceptance, which it was accepted. This remaining primary oil was allocated on the basis of a current production period, which covered a period of six months. * * * The last six months of 1959. * * * in

other words, it was a current rate established for that period of time for the individual lease, and the share of the remaining seven million six hundred thousand barrels was allocated on the proportion that that current production had to the total production for the entire Unit Area under that six months period. That was the basis for establishing the primary portion of our split formula.

"The secondary portion of this formula was that portion which each lease was allocated on the basis of waterflooding for secondary recovery, was done on the basis of acre feet. That is to say, the sand thickness under any given lease, times the number of acres under that lease, gives the total number of acre feet under that lease and that lease participated in the waterflood reserve as it related as that number of acre feet related to the total number of acre feet in the entire Unit Area."

We believe that the formulas here were fair to all concerned and we find that there was substantial evidence to support the unitization formula for protestants' percentage of participation. Producers Development Company v. Magna Oil Corporation, Okl., 371 P.2d 702.

 The protestants discuss Points IV, V and VI together. We think Point VII could come under this discussion also. We set out these Points:

"IV

"Order No. 47677, and the Plan of Compulsory Unitization approved by it, are unreasonable, arbitrary and discriminatory and are not supported by substantial evidence.

"V

"Order No. 47677, and the Plan of Compulsory Unitization, as same are applied against these Plaintiffs in Error, are in violation of the due process of law clause contained in the Fourteenth Amendment to the Constitution of the United States and Section 7,

Article II of the Constitution of the State of Oklahoma.

"Order No. 47677, and the Plan of Compulsory Unitization as approved by it, deny these Plaintiffs in Error equal protection of the laws guaranteed by the Fourteenth Amendment to the Constitution of the United States.

"VI

"Order No. 47677, and the Plan of Compulsory Unitization approved by it, constitute a taking of the property of these Plaintiffs in Error in violation of, and contrary to, Sections 23 and 24 of Article II of the Constitution of the State of Oklahoma.

"VII

"Order No. 47677, and the Plan of Compulsory Unitization approved by it, in all material respects, are violative of Title 52, Secs. 287.1 to 287.15, both inclusive, O.S., 1961."

These contentions simply challenge the Order No. 47677 and Plan of Unitization, as being unconstitutional under both State and Federal Constitutions.

We think these questions have been before us and decided adversely to protestants' contentions in Palmer Oil Corp. v. Phillips Petroleum Co., 204 Okl. 543, 231 P.2d 997, certiorari denied, Palmer Oil Corp. v. Amerada Petroleum Corp., 343 U.S. 390, 72 S.Ct. 842, 96 L.Ed. 1022; Spiers v. Magnolia Petroleum Co., 206 Okl. 503, 244 P.2d 843; Woody v. State Corp. Commission, Okl., 265 P.2d 1102.

It clearly appears from the evidence in this case that by waterflooding under this Unitization Plan the protestants will recover far more oil than they would from primary recovery.

Under Article IX, § 20 of the Oklahoma Constitution, it is provided:

" * * * The Supreme Court's review of appealable orders of the Corporation Commission shall be judicial only, and in all appeals involving an asserted violation of any right of the parties under the Constitution of the United

States or the Constitution of the State of Oklahoma, the Court shall exercise its own independent judgment as to both the law and the facts. In all other appeals from orders of the Corporation Commission the review by the Supreme Court shall not extend further than to determine whether the Commission has regularly pursued its authority, and whether the findings and conclusions of the Commission are sustained by the law and substantial evidence. Upon review, the Supreme Court shall enter judgment, either affirming or reversing the order of the Commission appealed from. * * *"

We have exercised our independent judgment as to both the law and the facts in this case and we think the Corporation Commission should be affirmed.

DAVISON, JOHNSON, WILLIAMS and JACKSON, JJ., concur.

BLACKBIRD, C. J., concurs in result.

WELCH and IRWIN, JJ., dissent.