**Clara Edith JONES, Executrix of the Estate of George C. Jones, Deceased, d/b/a Jones Oil Company, Plaintiff in Error,**

v.

**CONTINENTAL OIL COMPANY, Rockland Oil Company, and the Corporation Commission of the State of Oklahoma, Defendants in Error.**

**No. 41415.**

Supreme Court of Oklahoma.

Nov. 1, 1966.

John C. Buckingham, Fuller, Davis, Mc-Pherson & Buckingham, Oklahoma City, for plaintiff in error.

Ferrill H. Rogers, T. Murray Robinson, John Wimbish, Barth P. Walker, Walker, Lawrence & Harris, Oklahoma City, for defendants in error.

HALLEY, Chief Justice.

The Corporation Commission of Oklahoma, on December 29, 1964, entered Order No. 57171 in Cause CD No. 15,732 before it and by its order approved the creation of the Bayou Unit in Carter County, Oklahoma. The applicants therein were Continental Oil Company and Rockland Oil Company. Jones Oil Company protested the approval of the application and has appealed the denial of its protest and the creation of the Unit.

There was a full hearing before the Commission as is evidenced by a record of some 750 pages and one volume of exhibits. The Commission proceeded under the provisions of 52 O.S.1961, Sections 287.1–287.15.

It appears from the record that approximately three years prior to the hearing on this matter before the Corporation Commission the majority of the oil operators in the Bayou Field began a study of the secondary recovery possibilities of this field. A total of some 204 wells have been drilled in the field.

There are 21 producing sands in the field, said sands being generally designated as Pennsylvanian Sand Members. It was shown that some of the wells were producing from one or more of the sands, some from as many as 14 or 15 different sands, but that none of the wells were producing from all of the 21 sands.

The field, as envisioned by the Unitization Plan covers 1,230 acres. It was estimated that some 13,294,000 barrels of oil would be recovered by the secondary recovery operations.

Jones Oil Company, the Protestant, owned some 20.32% of the surface acres and had, at the time of the hearings before the Commission, 27.1% of the production in the area.

When the Plan of Unitization was circulated, 78% of the royalty owners and 71% of the lessees approved it. This is in excess of the statutory requirements. 52 O.S. 1961, Section 287.5.

Our review of this matter will follow the rule that we have heretofore adhered to in similar matters, as we set forth in the case of Vogel v. Corporation Commission, Okl., 399 P.2d 474, wherein it was stated:

"The rule is well established that if an order of the Corporation Commission appealed from is found to be supported by substantial evidence, it will be affirmed by this Court. The rule is clearly stated in Woody v. State Corporation Commission, Okl., 265 P.2d 1102, 1106, wherein it is stated in the body of the opinion: * * * In the orderly administration of law we must indulge the presumption that the Commission's order is just, reasonable, and correct.

"* * *

"'Our appellate jurisdiction, as applied to the case before us, is judicial only, and is limited to a consideration whether the Commission has legally pursued its authority, and whether its findings and conclusions are sustained by the law and substantial evidence. * * *'"

The Protestant raises five propositions as to the validity of Order No. 57171 and the Plan of Unitization approved by it. We will discuss them in order.

The first proposition made is that the 21 oil producing sands that underlie the Unit area are not a common source of supply and for that reason cannot be joined in one unitization plan. Protestant predicates this

proposition on three points. It asserts that the evidence is patently clear that the Pennsylvanian series of sands are composed of 21 different reservoirs. That when nature formed these reservoirs, they were distinct and separate accumulations of oil and gas. That the evidence offered by the applicants to the effect that because of the development, method and manner of production and operation, these 21 reservoirs now constitute a single common source of supply is insufficient because it was also shown that not all of the reservoirs were in communication with each other as not a single well was opened in all 21 zones.

Protestant, for its second point under its first proposition maintains that the proposed method of waterflooding negatives the presumption of a single common source of supply. This point is based on applicants evidence that the waterflooding in the Unit was to be a multi-stage flood, that is in four different stages, wherein a certain group of reservoirs will be open during one stage and another group will be open during another stage.

Its third point is to the effect that before the order of the Commission can be valid, the order must be separately applicable to the 21 reservoirs, each as a common source of supply. That since the order in question failed to treat the 21 reservoirs separately, it is invalid.

With Protestant's first proposition and its points thereunder, we do not agree. Witnesses, on behalf of the applicants, testified that all of the 21 producing sands were in communication with each other as a result of the completion and production practices used in the field. Evidence of a substantial nature was adduced that a common source of supply could be created, and was created in this instance, as to the particular sands involved, by opening them to the well bore in several sands. A portion of paragraph 4 of the Order of the Corporation Commission, omitting the description contained therein is set out as follows:

"4. That a part of Carter County, Oklahoma, described as * * * known as the Bayou Field is underlain by one or more of some twenty-one (21) Pennsylvanian Sand Stringers, which are generally found between the depths of 2,030 feet and 4,400 feet, and are identified as various members of the Bayou, M Series, and Lone Grove groups or the Stray, Norris and Chubby Sands. Development of the Pennsylvanian Sand in the Bayou Field commenced in the early 1920s; additional drilling was conducted in the late 1940s and the early 1950s, and at this time the field has been fully developed for approximately twelve (12) years; the existence and location of a large East-West trending fault across the northern portion of the field has been proven. There are in excess of two hundred (200) wells in the field. The typical well penetrates as many as fifteen (15) of the some twenty-one (21) Pennsylvanian Sand stringers, and many of the productive stringers penetrated have been perforated and commingled in the well bore. In a number of the wells in the field, the lower sand members were completed in the open hole and simultaneously produced with various perforated and commingled Pennsylvanian Sand stringers found above the point where pipe was set. In the history of the field, there has been no significant effort to isolate or segregate the various Pennsylvanian Sand stringers; the pattern of development and producing operations in the field have been to treat the various productive Pennsylvanian Sand stringers as a single common source of supply of oil and gas. There is considerable question as to whether it is now physically possible to completely and effectively separate and segregate the various stringers. In nature there was little, if any, effective communication between the various stringers of the Pennsylvanian Sand in the field. However, as a result of the completion and producing practices over many years, such Pennsylvanian Sand stringers are now in direct and/or indirect pressure communication with each other and the pressures within the stringers have equalized so as to

create and constitute, for all practical purposes, a single Pennsylvanian Sand common source of supply of oil and gas. Many of the wells in the field are in a stripper stage and it appears that the field as a whole is approaching its economic limits. With respect to remaining primary reserves, it would not be practical for this Commission to undertake to treat the various stringers of the Pennsylvanian Sand in the Bayou Pool other than as a single common source of supply of oil and gas. Further, in connection with the secondary recovery operations, it is neither practical nor economically feasible to attempt to segregate and separately operate and produce the various Pennsylvanian Sand stringers or lenses, although in the interest of efficient operations in the conduct of a waterflood, it might be or at sometime become advisable for an operator to attempt to segregate, to the extent possible, one group of the various sand stringers from the remaining stringers for the purpose of attempting to selectively inject and/or produce. The Commission therefore finds that said Pennsylvanian Sand stringers underlying the lands above described and found South and/or below the East-West trending fault shown on Exhibit 'A' attached to the Plan of Unitization, Bayou Unit, are a single common source of supply of oil and gas."

■ We feel, after a careful review of the evidence with reference to the above paragraph of the Order, that it is supported by substantial evidence, and should be approved by us, and we hereby approve the findings set out therein. The language we used in the case of Jones Oil Company et al. v. Corporation Commission et al., Okl., 382 P.2d 751, is particularly appropriate here. There we said:

"The fact remains that oil is being produced from these three sands through the same well bore. The evidence clearly shows that it would be uneconomical to make three separate units of these sands. To us it would violate the very reasons

for unitization as set out in the first section of the Unitization Act passed in 1951, which is 52 O.S.1961, § 287.1, and is as follows:

'The Legislature finds and determines that it is desirable and necessary, under the circumstances and for the purposes hereinafter set out, to authorize and provide for unitized management, operation and further development of the oil and gas properties to which this Act is applicable, to the end that a greater ultimate recovery of oil and gas may be had therefrom, waste prevented, and the correlative rights of the owners in a fuller and more beneficial enjoyment of the oil and gas rights, protected.'

"* * * For us to hold otherwise on this Point would violate the spirit of unitization."

■ Protestant's second point under its first proposition is without merit. Applicant's witnesses testified that there would be some attempt at segregation in order to determine flood performance and in the interest of flood efficiencies, but that complete effective segregation would not be physically possible. All of this is to say that the flood would be developed in stages, which is common, whether the reservoir is a single massive sand or a series of sands.

■ Likewise, the third point raised by Protestant under its first proposition fails. The authorities quoted by the Protestant in support of its position does not fall squarely within the rule sought by the Protestant under this point. Here the Commission did not find 21 separate common sources of supply but found that the 21 different producing sands in the field constituted a common source of supply, thereby negating the rule sought by the Protestant under the authority of In re Lovell-Crescent Field, Logan County, Okl., 198 Okl. 284, 178 P.2d 876.

■ Protestant's second proposition is generally to the effect that the Plan is not feasible and that it is not supported by

substantial evidence. This argument is largely buttressed by a showing on the part of the Protestant of the differences of opinion expressed by its expert witnesses as compared with the opinions of experts testifying for the Applicant's. As we stated in the case of Chenoweth v. Pan American Petroleum Corporation, Okl., 382 P.2d 743, the determination of whether there "is substantial evidence" to support an order of the Corporation Commission does not require that the evidence be weighed, but only that the evidence tending to support the order be considered to determine whether it implies a quality of proof which induces the conviction that the order was proper or furnishes a substantial basis of facts from which the issue tendered could be reasonably resolved. In this same vein, see Yellow Transit Co. v. State, 198 Okl. 229, 178 P.2d 83. A careful review of the evidence on this point convinces us that there was presented evidence reasonably and substantially supporting the position of the Applicant's, all to the effect that the Plan of Unitization was and is feasible. Therefore, we must hold against the Protestant on its second proposition.

■ Protestant advances his third and fourth propositions together. They generally are to the effect that the primary formula for allocating unit production under the Plan is discriminatory and inequitable, and the share of unit production allocated and apportioned to each separately owned tract by the Plan is not fair, equitable and reasonable as is required by the statute, 52 O.S. 1961, Sec. 287.4. In pointing out the inequities of the Plan, Protestant asserts that if the year 1963 instead of the year 1962 had been used as the base period, that its primary equity would have been 4½% greater. Protestant's argument in this connection is considerably weakened by evidence which showed that it had reworked its wells in 1963 with a resulting increase in production for the year 1963 as compared

with the year 1962. We see nothing wrong with using the year 1962 as a basis for the current production factor. That year, 1962 reflects the natural condition of the reservoir rather than its condition as affected by well work-overs. See Jones Oil Company v. Corporation Commission, supra.

■ Protestant's other objection to the allocation of unit production is essentially based on the idea that although the various sands are not of the same quality, there was no attempt to evaluate each of the sands and the secondary formula treats all of the sands as if they were of the same quality and value. The record of the evidence before the Commission and before us does not support this contention. Expert witnesses for the Applicants testified that the quality of the sands was considered (and evaluated) in this connection.

■ Under the second part of Protestant's fourth proposition it makes complaint of the fact that in its order the Commission allowed for the correction of certain mistakes. These mistakes were of a mechanical nature and could be corrected without any re-evaluation of engineering or geological interpretations. The nature of these mistakes offer no basis for an objection on the part of the Protestant.

Protestant's fifth proposition is of a broad nature, wherein it asserts that the order of the Commission violates the Unitization statute, 52 O.S.1961, Secs. 287.1 to 287.15, inclusive. Protestant asserts that its first four propositions support its fifth proposition. Since we have already held contrary to the arguments advanced by the Protestant in support of his first four propositions, it stands without reason that its fifth proposition also fails.

The order of the Commission is affirmed.

JACKSON, V. C. J., and DAVISON, WILLIAMS, BLACKBIRD, IRWIN and BERRY, JJ., concur.