No. 91,733

THE TREES OIL COMPANY, *Appellant*, v. STATE CORPORATION COMMISSION, CHESAPEAKE OPERATING, INC., OXY-USA, INC., and ANADARKO PETROLEUM CORPORATION, *Appellees*.

105 P.3d 1269

Opinion filed February 18, 2005.

*C. Michael Lennen*, of Morris, Laing, Evans, Brock & Kennedy, Chtd., of Wichita, argued the cause and was on the brief for appellant.

*John G. McCannon, Jr.*, assistant general counsel, argued the cause, and *Susan B. Cunningham*, general counsel, was with him on the brief for appellee Kansas Corporation Commission.

*Jeff Kennedy*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, argued the cause, and *Stanford J. Smith*, of the same firm, was with him on the brief for appellee OXY-USA, Inc.

*Spencer L. Depew*, of Depew Gillen Rathbun & McInteer, LC, of Wichita, argued the cause and was on the brief for appellee Anadarko Petroleum Corporation.

The opinion of the court was delivered

*Per Curiam*: This is an administrative appeal pursuant to K.S.A. 77-601 *et seq.* from the decision of the district court of Haskell County, Kansas, affirming the order of the State Corporation Commission of Kansas (KCC or Commission) granting the application of Chesapeake Operating Inc. (Chesapeake) to allow the compulsory unitization and unit operation of the South Eubank Waterflood Unit (Unit) pursuant to the Kansas Unitization Act, K.S.A. 55-1301 *et seq.*, over the continuing objection of The Trees Oil Company (Trees).

The first issue was one of first impression involving the statutory definition of an oil and gas "pool" as defined in K.S.A. 55-1302, when considered by the KCC and district court. This issue becomes one of last impression as the result of 2004 amendments to K.S.A. 55-1302 which now clearly grant the rights Trees contests, as will be fully discussed in our opinion. See L. 2004, ch. 115, sec. 1.

Trees' second, third, and fourth issues involve the application of administrative law to the KCC orders and relate to the involuntary inclusion of Trees' property within the Unit, whether there was substantial competent evidence to uphold the KCC findings and rulings, and if the KCC acted arbitrarily and capriciously in refusing to allow Trees to present additional geological evidence at a second hearing the Commission ordered to consider only the fairness of the terms of the Unit Operating Agreement.

In order to fully understand the issues on appeal, it is necessary that we set forth in considerable detail the procedural history of this appeal, the evidence presented, the findings and orders of the KCC, and the rulings of the district court.

## Procedural History and Factual Background

Several oil and gas operators, Chesapeake, OXY-USA, Inc. (OXY), and Anadarko Petroleum Corporation (Anadarko), own 16 oil and gas wells that produce oil out of a 3.7 miles long and 500-

to 1,500-foot wide incised Chester and Morrow formation channel and desired to inject water into the Chester formation to produce substantial additional oil production beyond that possible with conventional pumping methods.

Trees owns and operates one oil and gas well on 80 acres within the southern boundary of the proposed water flood project and, after attending two planning meetings in mid-2000, informed the other operators it did not wish to voluntarily participate in the project.

Planning on the project continued and, on June 27, 2001, Chesapeake filed an application with the Commission that sought unitization and unit operations of the area above described. OXY and Anadarko were allowed to intervene.

Trees filed a protest and request for a continuance in mid-July 2001. The hearing, which had originally been set for August 2, 2001, was continued, first to September 6, 2001, and later to September 20, 2001.

The hearing took place on September 20, 2001, with the Commission taking testimony from five technical witnesses and admitting exhibits. Posthearing briefs were filed, the record was closed, and the Commission took the matter under advisement.

On March 12, 2002, the KCC issued an Interim Order Requiring Additional Evidence, in which it stated: "The Commission has before it ample record and is ready to rule on the conditions in K.S.A. 55-1302(a) and (b)," but reopened the record for the specific purpose of receiving additional testimony as to whether specific terms of the Unit Operating Agreement were fair and equitable to all parties.

On April 3, 2002, the Commission heard additional evidence concerning the fairness of the specific terms of the Unit Operating Agreement. The Commission refused to reopen the record to allow Trees to present additional geological testimony.

On April 18, 2002, the KCC issued a detailed 26-page order of findings and conclusions granting Chesapeake's application for unitization and unit operations of the South Eubank Waterflood Unit. Trees' petition for reconsideration was denied, and it then filed a

petition for judicial review before the Haskell County District Court.

Briefs were filed, oral arguments were held, and, on December 12, 2003, Haskell County District Judge Tom R. Smith issued a comprehensive 18-page decision in which the rulings and orders of the Commission were affirmed. Trees appealed.

We have jurisdiction by transfer on our own motion pursuant to K.S.A. 20-3018(c).

Ten pages of the Commission order contained a summary of the evidence presented which we will condense somewhat to show the testimony of the proponents and opponents of the application.

Rodney J. Vaeth, a Chesapeake expert landman, presented copies of the Unit Agreement and the Unit Operating Agreement which he testified incorporated the statutory requirements of the Kansas Unitization Act and met the required statutory percentages of both royalty and working interest owners who had approved both agreements. He testified 93.39152 percent of the working interest owners had approved Phase I of the agreements and 94.47862 percent had approved Phase II of the agreements. He further testified 69.396548 percent of the royalty owners on a surface acre basis had approved the agreements, that 64.00343 percent of the royalty owners had approved Phase I and 67.35903 percent of the royalty owners had approved Phase II of the agreements.

Jimmy W. Gowens, a petroleum geologist, testified for Chesapeake and described the reservoir and unit areas as portions of the Morrow and Chester sand formations in an incised channel 3.7 miles long and between 500- to 1,500-foot wide and described how the boundaries were established by the technical committee by seismic data and other factors. He noted that, within the field, Chesapeake operated 12 wells, Anadarko 4 wells, and Trees operates 1 well. He described the Chester sand as continuous from the north boundary of the Unit to the south boundary.

Gowens had personally been involved in drilling all of the Chesapeake wells. He testified seven of the wells within the proposed unit area have commingled production from both the Chester and Morrow formations and, as the result of such dual completions, both of the formations are in pressure communication.

Gowens testified he had prepared the hydrocarbon pore volume (HPV) maps which were used in determining the participation formulas. On cross-examination, he said the HPV values are a very reliable measure of oil in place.

In rebuttal testimony, Gowens said he doubted the ability of Trees to use the Lou Ethel well (a well south of Trees' Josephine well which was included in the Unit) as an injection well for a mini waterflood. He questioned whether there was communication between the two wells because of the possibility of a separating fault.

Chesapeake then presented the testimony of Dan Scott, a petroleum engineer with 22 years of experience. He testified the unit area is underlaid by productive Chester sand which is in good pressure communication throughout the Unit making it an excellent waterflood candidate.

Scott testified the project was economic and would result in incremental secondary recovery of at least 690,000 barrels of oil, a figure he believed to be conservative. He said the increased recovery would not be achievable through primary operations and would therefore prevent waste. The project, based on an oil price of $20 per barrel, was expected to achieve a gross profit of $6.2 million.

Scott then testified in detail regarding the determination of the unit participation percentages and formula. The parameters used included remaining primary reserves, current production, Chester well bores, Chester HPV, and Chester ultimate recovery. He opined the use of these parameters and resulting unit formula was fair and equitable and that 94 percent of the working interest owners had approved the two-phase participation formula.

The two-phase formula was described as Phase I with 50 percent remaining primary reserves and 50 percent current production and Phase II being 5 percent Chester well bores, 47.5 percent Chester HPV, and 47.5 percent Chester estimated ultimate recovery. Scott said he had been working on the waterflood since the summer of 1999 and had devoted over 1,000 hours to the study of the project.

Scott also testified in rebuttal to Trees' witnesses. He opined that the Trees' Josephine well was in pressure communication with the other Chester wells in the proposed unit. He said the reservoir pressure at that time was approximately 400 psi but that, through

injection under pressure, they intended to bring reservoir pressure back to 1,500 psi. He testified the Trees' Josephine well, if allowed to remain a producer, would become much more productive as the result of the proposed waterflood with much of the production coming from the unit area as the result of migration of oil across the lease line in violation of correlative rights.

Scott strongly disagreed with Trees' witness Hupp that efficient operation of the Leather's Land 2-10 well (located directly north of the Josephine well) could prevent migration of oil. He noted that the initial production rate of the Leather's Land 2-10 well was only 87 barrels of oil a day and that injection rates would be as high as 1,100 barrels per day causing oil to bypass the Leather's Land 2-10 well and be pushed to the Josephine well in violation of correlative rights. Scott disagreed with Hupp, who had suggested the narrowness of the channel would prevent migration, pointing out a well bore is only 7 or 8 inches wide and the reservoir at the Leather's Land 2-10 well is over 1,000 feet wide, approximately the length of over 3 football fields. Scott estimated the amount of oil that could be lost by migrating of oil off the Unit onto the Trees' well could be as much as 18,000 barrels if Trees were omitted from the Unit.

Scott testified the natural state of the formations had been altered by commingling the Morrow and Chester formations in seven of the well bores, and the two zones are in pressure communication which means, from a pressure standpoint, they are one and the same. He further said it was intended to leave both sets of perforations open in the commingled wells that would become injection wells which could lead to additional recovery and production from the Morrow formation.

Scott opined the value of the Josephine lease without waterflooding would be approximately $130,000 but by implementation of the project the value could increase to $390,000 and that the increase in present net worth at a 10 percent discount rate was approximately $250,000.

Finally, Scott testified the wells in the proposed unit are in imminent danger of being abandoned due to economics and low levels of primary production.

Trees presented the testimony of Thomas G. Pronold, a geologist, and Kenton Hupp, a petroleum engineer.

Pronold testified the Chester formation in this area has different pressure compartments which could minimize the effectiveness of the proposed waterflood. He did not present any pressure studies to support this statement. Pronold acknowledged he could not determine whether interest owners were receiving credit for Morrow pay that was not actually producing. He did not present any seismic data on behalf of Trees, although it was available, in support of the possibility that the Morrow formation might be productive in the area of the Josephine well and acknowledged he would not recommend Trees to drill a well there for Morrow production.

Pronold acknowledged that seven of the wells in the area had been commingled between the Chester and Morrow formations as had been permitted by Commission orders.

Hupp testified that the technical committee undervalued the remaining reserves under the Josephine 1-15 well because it did not honor late term amounts of Trees' production. He did acknowledge that September 2000 through February 2001 production amounts would have been below the decline curve and that he did not account for those points in developing his exhibit.

Hupp said that geologic mapping was prepared without input from Trees but did acknowledge that he knew Trees had representatives at two technical committee meetings and a geophysicist present at the meeting on July 10, 2000. Hupp admitted that he believed the project was valid from an engineering standpoint and that the Chester formation is floodable.

Hupp expressed concern that Trees would not get credit for Morrow reserves but did acknowledge that he was not aware of any other operation in the Unit that was to receive credit for Morrow production that was not actually being produced. He acknowledged Trees would be getting a share of Morrow production from the Unit even though there would be no Morrow production from the Trees' tract itself.

Hupp criticized the use of HPV or oil in place as a parameter in the participation formula as being unreliable and speculative, although he acknowledged he had previously advocated use of oil in

place before the Commission and that the Commission had used HPV on unit orders before.

Chesapeake and Trees presented additional testimony on April 3, 2001, in response to the Commission's interim orders limited to the fairness of the terms of the Unit Operating Agreement.

Professor David E. Pierce of the Washburn University School of Law, who teaches in the oil and gas law area, qualified as an expert witness and testified on behalf of Chesapeake. He was familiar with the agreements and said they were patterned after the model forms of the American Petroleum Institute. They are standardized provisions generally used in the oil and gas industry and satisfied the statutory requirements of the Kansas Unitization Act, K.S.A. 55-1301 *et seq*.

Professor Pierce opined the agreements were fair in that all owners were treated the same. Decisions were required to be made in good faith and provided adequate protection for the interests of an unwilling participant. Pierce specifically testified the "recovery of costs" provision of the Unit Operating Agreement was authorized by statute and was fair in that if a nonoperating working interest owner elected not to assume additional risk, it compensated the operator for the additional risk it assumed when it financed the operation.

Gayle Gentry Bishop testified on behalf of Trees. She is its president, principal shareholder, and has had operating responsibility for the past 17 years. Bishop said she felt the agreement was unfair to Trees because, as an unwilling participant, it was being forced to take risks it did not wish to take. It had no practical way to protect itself from majority decisions that Trees believed to be adverse to its interests. She objected to lost cash flow and being required to contribute to unit expenses.

Bishop said Trees had not known it could be forced to participate in the project and had not perceived a need to be involved in Unit planning.

There were three provisions of the agreement which Bishop believed to be unfair. Article 4.3 was objected to because it allowed decisions by a majority vote and, consequently, the other participants would effectively control unit operations. She further ob-

jected to Chesapeake and OXY determining the values of personal property delivered to the Unit and expressed concern about the future use of a tank battery that was also used for Trees' Lou Ethel No. 15 well.

Chesapeake presented Scott on rebuttal. He testified the cash flow impact on Trees was proportionate to all participants. As to the equipment valuation objection, he testified that all equipment owned by Trees in connection with the Josephine well, except for the casing, would be pulled and returned to Trees so no valuation would be needed. As to the tank battery in question, it would not be disturbed by unit operation and would remain fully available for use in connection with Trees' Lou Ethel well which was not a part of the Unit.

### Rulings and Orders of the Kansas Corporation Commission

The Commission order first recited the evidence presented as has been summarized above. It was then noted that Trees raised a threshold legal issue that the proposed unitization could not go forward because it violated the statutory requirements for unit operation of a "pool," defined in K.S.A. 55-1302 as

"an underground accumulation of oil and gas in a single and separate natural reservoir characterized by a single pressure system so that production from one part of the pool affects the reservoir pressure throughout its extent."

Trees' argument was said to center on the wording "single and separate natural reservoir" as precluding unitization of two reservoirs connected by well bores completed so that the formations become commingled.

The Commission declined to apply what it characterized as a narrow and restricted reading of the statute because it deemed that doing so would result in substantial waste including loss of 690,000 barrels of oil production and economic loss of approximately $6.2 million of gross profits after expenses.

It was noted this was a matter of first impression in Kansas, although two Oklahoma cases had determined a pool such as exists here would be acceptable under the Oklahoma statute. The word "natural" is not used in the Oklahoma statute, so the Commission

determined it must address that feature of the Kansas statute to determine if it should result in denial of the Chesapeake application.

The Commission pointed out that the Kansas Unitization statute is founded on the public policy of prevention of waste, conservation of oil and gas, and protection of correlative rights. *Parkin v. Kansas Corporation Commission*, 234 Kan. 994, 1006, 677 P.2d 991 (1994). There is no indication the legislature intended to prevent oil bearing reservoirs from unit operation because of commingled production of what was originally separate reservoirs. The fact deemed the most significant was that waste could be prevented by allowing unit operation of the Chester formation.

The Commission's order then looked to the rule of statutory construction set forth in *Todd v. Kelly*, 251 Kan. 512, 516, 837 P.2d 381 (1992), that

" 'courts are not permitted to consider only a certain isolated part or parts of the act, but are required to consider and construe together all parts *in pari materia. When the interpretation of some one section of an act according to the exact and literal impact of its words would contravene the manifest purpose of the legislature, the entire act should be construed according to its spirit and reason, disregarding so far as may be necessary the strict letter of the law.*' [Citation omitted.]"

The order pointed out the legislature had previously amended the act to make unitization easier to accomplish by lowering the 75 percent sign up requirement in the original act to 63 percent. The clear intent of the statute would not be advanced by giving "natural" the significance Trees urged. It was noted the word "natural" may have been used for unrelated reasons and there was no reason within the statutory scheme for such a narrow interpretation.

The Commission noted this specific question, while not the subject of any Kansas cases, had been addressed by Professor Ernest E. Smith in an article on the Kansas Unitization Act, Smith, *The Kansas Unitization Statute: Part II*, 17 Kan. L. Rev. 133, 137 (1968), which the Commission quoted as follows in its order:

" '[The Kansas statute] requires "a single and separate natural reservoir characterized by a single pressure system so that production from one part of the pool affects the reservoir pressure throughout its extent." If "natural" is read as defining

"reservoir" and not "single pressure system"—as, indeed seems the most obvious construction—then a series of vertically separated reservoirs which have been brought into pressure communication through multiple-completion drilling and production techniques would qualify as a "pool" under the statute and could be developed as a single unit under the act. Such a construction would be entirely consistent with the definition, in that production from one such reservoir would affect the pressure throughout all the reservoirs. It would also be consistent with the purposes of the act insofar as these include the avoidance of economic waste and uneconomical methods of production.' "

The Commission stated it agreed with this reasoning. It also noted the Chester and Morrow formations had previously been authorized to be commingled by a Commission order and there was not expected to be any significant recovery from the Morrow formation, with the primary production coming from the secondary recovery of the Chester formation.

The Commission noted it would not be prudent to separate the formations at this time as it would be costly, without benefit, and any possible Morrow production would be lost. The Commission's order concluded that the interpretation called for by Trees is not required and it "will not interpret the statute to require foregoing over $6 million in additional production because the reservoir to be unitized for secondary recovery is incidentally connected to a reservoir, such as the Morrow formation, with no secondary recovery potential of its own."

The Commission order then looked at the additional issues Trees raised as to the fairness of the allocations and the Unit Operating Agreement itself as it impacts a minority working interest owner. The Commission said that it had taken a closer look at the agreement but was satisfied that the proposed unit is fair and equitable to all participants.

As to the allocation formula, it was found to use well recognized measures and was reasonable. The cut-off point was reasonable, and the fact Trees gave fracture treatment to its Josephine well to temporarily increase production in April 2001, after the January to May 2000 period used, did not improperly affect the allocations of interests. The allocation of the Morrow production to Phase I of the allocation was found to be reasonable because of the existence of some Morrow production.

While a short-term revenue loss to Trees would result from conversion of the Josephine well from a producing well to an input well, there was substantial credible evidence that the value of Trees' lease with unit operation is higher than without. All participants lose short-term cash flow but will recover its allocated share of unit production.

The Commission order then moved to the three Trees' claims of unfairness in the Unit Operating Agreement addressed by the April 3, 2000, hearing and found: (1) There was nothing inherently unfair about majority rule where the majority was obligated to use good faith and equally treated all participants, (2) valuations of personal property must be treated fairly and, based on the Scott testimony, there would be no valuation questions, and (3) the Trees' tank battery remained usable in conjunction with another well.

The Commission order noted Trees' protest had not been helpful in improving the agreement and that "[Trees] only wants out." Trees' request to be omitted from the Unit would violate the public interest as well as correlative rights. Under the statute, waste or harm to correlative rights would occur without Trees being included in the Unit. Convincing evidence of this is that omission of the Trees' tracts and Josephine well would allow as much as 18,000 barrels of oil to migrate from the Unit onto the Trees tracts. The remaining well on that end of the Unit would not adequately prevent this migration. The Commission concluded this discussion by stating: "Prevention of harm to correlative rights is one of the principal goals of the Unitization statute and supports keeping the Trees tract in the Unit."

The Commission's order held that the Chester and Morrow formations had been commingled and now constituted one common source of supply, approved the described unit area for a waterflood operation, found without unit operations substantial waste would occur, found participation percentages were fair to Trees and other participants, approved the Unit Operating Agreement as fair and equitable, held exclusion of Trees from the Unit would violate correlative rights by allowing 18,000 barrels of oil to migrate from the

Unit to Trees' tracts, and found all applicable statutory require-
ments had been satisfied.

It is from these findings and orders that Trees appealed pursuant
to the Kansas Act for Judicial Review and Civil Enforcement of
Agency Actions (KJRA), K.S.A. 77-601 *et seq.*, to the District Court
of Haskell County, Kansas.

## District Court Decision

The District Court of Haskell, Kansas received briefs from all
the parties, reviewed the testimony and exhibits, heard their oral
arguments, and on December 12, 2003, affirmed the KCC in a
well-reasoned 18-page written decision which set forth the issues
as follows:

1. "The Trees Oil Company alleges the State Corporation Commission erred,
because they ordered compulsory unitization and unit operation of two separate
natural reservoirs and in so doing, they have misinterpreted or erroneously applied
Kansas law and pursuant to K.S.A. 77-621(c)(4) this Court should reverse and set
aside the order issued by the State Corporation Commission in this proceeding."

2. "The Trees Oil Company further claims the finding by the State Corpo-
ration Commission to include the tracts of land operated by the Trees Oil Com-
pany in the South Eubank Unit is not supported by substantial, competent evi-
dence in the record and should be reversed and set aside by this Court pursuant
to K.S.A. 77-621(c)(7)."

3. "A third claim raised by the Trees Oil Company in this proceeding is the
exclusion of the Trees Oil Company's proffered testimony was unreasonable, ar-
bitrary and capricious and should be reversed pursuant to K.S.A. 77-621(c)(8)."

4. "In their fourth claim of error, The Trees Oil Company claims the State
Corporation Commission's finding that the deletion of those tracts of land oper-
ated by the Trees Oil Company from the proposed unit would cause correlative
rights violations and is not supported by substantial, competent evidence in the
record as a whole and should be reversed by this Court pursuant to K.S.A. 77-
621(c)(7)."

5. "The fifth and last issue raised in this proceeding by the Trees Oil Company
is their claim the unit participation factors or percentages assigned to them did
not fairly and equitably assign relative value to the Tree Oil Company's tract.
Therefore, the Order amounts to an unconstitutional taking of the Trees Oil Com-
pany's property and should be reversed and set aside by this Court pursuant to
K.S.A. 77-621(c)(1)(7)(8)."

The district court noted the power of review by the courts does
not give the court authority to substitute its judgment for that of

the Commission, see *Farmland Industries, Inc. v. Kansas Corporation Comm'n,* 24 Kan. App. 2d 172, 176, 943 P.2d 470 (1997), *rev. denied* 263 Kan. 885 (1997), and the burden was on Trees to show the Commission's orders were invalid. See K.S.A. 77-621(a)(1).

The district court first considered Trees' second and fourth claims of error that the findings of fact of the KCC were not supported by substantial evidence. These claims relate to the inclusion of the Trees' tracts in the Unit and that deletion of the tracts from the Unit would violate correlative rights. These two contentions were stated to deal with the same issue in a slightly different manner.

The court found there was substantial evidence to uphold the KCC's findings. It was noted the Commission, as the trier of fact, has the right to determine the credibility of the witnesses and the weight such testimony is to be given. Correlative rights were stated to mean that each owner or producer in a common source of supply can only take a proportional share of the oil obtainable, *Aylward Production Corp. v. Corporation Commission,* 162 Kan. 428, 431, 176 P.2d 861 (1947), and that the protection of such rights is one of the KCC's obligations, *Mobil Exploration & Producing U. S. Inc. v. Kansas Corporation Comm'n,* 258 Kan. 796, Syl. ¶ 1, 908 P.2d 1276 (1995).

The court found substantial evidence in the record showed Trees would cause correlative rights to be violated if excluded from the Unit and, if it was not included, it would gain a substantial amount of oil from the waterflood operations for the oil production from its one well.

As to the third claim of error, that the exclusion of Trees' proffered testimony is unreasonable, arbitrary, and capricious and should be reversed pursuant to K.S.A. 77-621(c)(8), the court restated the facts of the dates of the filing of the applications and hearings as we have previously set forth. It was noted that Trees had attended two meetings to discuss the Unit in mid-2000, and the supplemental geographical evidence Trees attempted to submit at the April 3, 2002, hearing was available and could have been presented at the September 2001 hearing.

The proffered evidence was not on the issue of the fairness of the operating agreement, which was the sole purpose of the second hearing. The 2-D seismic study was based on information which could have been presented in September 2001, and there was no objection or request to complete this analysis at that time. The legal concept was found to be the same as existed in *Western Resources, Inc. v. Kansas Corporation Comm'n*, 30 Kan. App. 2d 348, 42 P.3d 162 (2002).

The district court found the KCC was not arbitrary, capricious, or unreasonable in refusing to consider the proffered testimony submitted by Trees in March 2002.

The district court next visited Trees' fifth claim of error that the participation factors or percentages assigned to it did not fairly and equitably assign a relative value to the Trees' tracts.

The court noted there was substantial competent evidence to support the Commission's findings which were exhaustively detailed in its order. The allocations were found to be fair and equitable as opposed to Trees' claims they were not protected equally by the order in violation of the Equal Protection Clauses of the United States and Kansas Constitutions. Trees was found to have failed to demonstrate systematic unequal treatment and, thus, did not carry its burden of proof on this contention.

This left the statutory claim relating to the definition of "pool" in K.S.A. 55-1302 to be considered. It was first noted that, by virtue of the two formations being commingled with seven wells, they were in pressure communication and, therefore, no longer separate pools. The Kansas definition we have previously set forth was restated followed by the definition of pool found in Williams and Meyers, Oil and Gas Terms, 554 (1981):

"an underground accumulation of petroleum in a single and separate natural reservoir characterized by a single pressure system so that production of petroleum from one part of the pool affects the reservoir pressure throughout its extent. A pool is so bounded by geological barriers that it is effectively separated from other pools that may be present."

The district court noted that the above definition is the same as found in K.S.A. 55-1302, with the exception that the last sentence is excluded from the statutory definition.

The court found "that the Kansas definition of 'pool' is most influenced by a single pressure system. Indeed, to prevent waste, or to most effectively produce oil or gas, reservoir pressure is the single most important issue."

The court noted the KCC's reliance on the Smith article in the Kansas Law Review and that Smith relied on two Oklahoma cases, *Jones Oil Company v. Corporation Commission*, 382 P.2d 751 (Okla.) *cert. denied* 375 U.S. 931 (1963), and *Jones v. Continental Oil Co.*, 420 P.2d 905 (Okla. 1966).

In the first *Jones* case, 275 wells were unitized with 61 of the wells producing from two or three separate sands. The Oklahoma Corporation Commission's finding that, because of the three producing strata, there was one common source of supply and that the pressure in the three strata were substantially the same was affirmed by the Oklahoma Supreme Court.

The facts were even more striking in the second *Jones* case as there were 204 wells in the field having 21 different producing sand formations. Some wells produced from as many as 14 or 15 well bores although no one well was opened in all 21 zones. The court found that openings in common well bores were now a common source of supply having direct or indirect pressure communication.

The district court restated Professor Smith's analysis which we have previously set forth and Smith's observations that Kansas should reach the same result despite the difference in statutory language.

The court then noted that Trees had argued that cases from Texas supported its position and analyzed two which related to proration orders by contained language stating that separate reservoirs cannot be transformed into one common reservoir by completing the wells in two or more zones. The cases, *Railroad Commission v. Groford Oil Corp.*, 557 S.W.2d 946 (Tex. 1977), and *Gage v. Railroad Commission*, 582 S.W.2d 410 (Tex. 1979), were not deemed persuasive to the district court because the Texas Legislature amended Texas statutes to give the Railroad Commission the authority to prorate production from commingled reservoirs caused by operation through common well bores as if they were a

common source of supply. See *Pend Oreville Oil & Gas v. Railroad Commission,* 788 S.W.2d 878 (Tex. App. 1990). The Texas cases were thereby distinguished and discounted.

The court then noted the broad authority of the Commission to regulate production of oil, to prevent waste, and to prevent inequitable or unfair taking from a common source of supply. *Mobile Exploration and Producing,* 258 Kan. 796, Syl. ¶ 1. It pointed to the long-time holding that the interpretation of a statute by an administrative agency charged with the responsibility of enforcing a statute is entitled to judicial deference, called the doctrine of operative construction, and deference to an agency's interpretation is particularly appropriate when the agency is one of special competence and experience. See *Lyon-Coffey Electric Co-Op, Inc. v. Kansas Corporation Comm'n,* 29 Kan. App. 2d 652, 655, 31 P.3d 962, *rev. denied* 272 Kan. 1418 (2001).

The court stated that legislative intent must be determined from consideration of the entire Unitization Act and every part thereof, that the KCC is an agency of special competence and experience in oil and gas matters with prevention of waste being of primary importance, and held "to this end the decision by the State Corporation Commission to find that two separate oil reservoirs that have been penetrated by common well bores and that are in pressure communication [with each other] are in [e]ffect a single pool and unit operations may be ordered." With this finding, the orders of the KCC were affirmed, and Trees' appeal was denied.

## Scope of Review of Agency Actions to the Kansas Supreme Court

This appeal by Trees is from the orders and findings of the KCC as allowed by the KJRA and brings into application the following scope of review sections of K.S.A. 77-621:

"(a) Except to the extent that this act or another statute provides otherwise:

(1) The burden of proving the invalidity of agency action is on the party asserting invalidity; and

(2) the validity of agency action shall be determined in accordance with standards of judicial review provided in this section, as applied to the agency action at the time it was taken.

. . . .

"(c) The court shall grant relief only if it determines any one or more of the following:

(1) The agency action, or the statute or rule and regulation on which the agency action is based, is unconstitutional on its face or as applied;

. . . .

(4) The agency has erroneously interpreted or applied the law;

. . . .

(7) The agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or

(8) the agency action is otherwise unreasonable, arbitrary or capricious."

As we are instructed by *Reed v. Kansas Racing Comm'n*, 253 Kan. 602, 609-10, 860 P.2d 684 (1993):

"We exercise the same review of the agency's action as does the district court. *Peck v. University Residence Committee of Kansas State Univ.*, 248 Kan. 450, 455-56, 807 P.2d 652 (1991). We must accept as true the evidence and all inferences to be drawn therefrom which support or tend to support the findings of the trial court. We are to disregard any conflicting evidence or other inferences which might be drawn therefrom. *Vakas v. Kansas Bd. of Healing Arts*, 248 Kan. 589, 604, 808 P.2d 1355 (1991). 'A rebuttable presumption of validity attaches to all actions of an administrative agency and the burden of proving arbitrary and capricious conduct lies with the party challenging the agency's action. [Citations omitted.]' "

Because one of the principal issues here involves the interpretation of a statute, we are obligated to apply the doctrine of operative construction as we stated in *GT, Kansas, L.L.C. v. Riley County Register of Deeds*, 271 Kan. 311, 317, 22 P.3d 600 (2001):

" ' "The interpretation of a statute by an administrative agency charged with the responsibility of enforcing that statute is entitled to judicial deference. . . . Further, if there is a rational basis for the agency's interpretation, it should be upheld on judicial review. If, however, the reviewing court finds that the administrative body's interpretation is erroneous as a matter of law, the court should take corrective steps. The determination of an administrative body as to questions of law is not conclusive and, while persuasive, is not binding on the court. [Citations omitted.]" ' "

However, in *State ex rel. Stephan v. Kansas Racing Comm'n*, 246 Kan. 708, 720, 792 P.2d 971 (1990), we said that

"when a statute is ambiguous, the interpretation placed upon it by an administrative agency whose duties are to carry the legislative policy into effect should be given great weight and may be entitled to controlling significance when the scope and limitations of the powers of the agency must be determined in judicial proceedings. [Citations omitted.]"

Additional rules of statutory construction must be considered which we will recite as we discuss the first issue dealing with the interpretation of when a "pool" is subject to a unitization order.

## I. Interpretation of the term "pool" in K.S.A. 55-1302 of the Kansas Unitization Act, K.S.A. 55-1301 *et seq.*

The history of unitization of oil and gas operations is well described in Smith, *The Kansas Unitization Statute: Part I*, 16 Kan. L. Rev. 567 (1968), where it is observed: "Unfortunately, the very factors which make fieldwide unitization desirable frequently prevent its being achieved through voluntary agreement."

The factors which must be found for the Commission to order unitization and unit operations are set forth in K.S.A. 2003 Supp. 55-1304 as the following:

"(a) (1) The primary production from a pool or a part thereof sought to be unitized has reached a low economic level and, without introduction of artificial energy, abandonment of oil or gas wells is imminent; or (2) the unitized management, operation and further development of the pool or the part thereof sought to be unitized is economically feasible and reasonably necessary to prevent waste within the reservoir and thereby increase substantially the ultimate recovery of oil or gas;
"(b) that the value of the estimated additional recovery of oil or gas substantially exceeds the estimated additional cost incident to conducting such operations; and
"(c) that the proposed operation is fair and equitable to all interest owners."

The Unitization statutes make many other references to operations of a "pool," which is defined in K.S.A. 55-1302 as follows:

"The term 'pool' as herein used shall mean an underground accumulation of oil and gas in a single and separate natural reservoir characterized by a single pressure system so that production from one part of the pool affects the reservoir pressure throughout its extent."

In its protest to Chesapeake's Application for Unitization and Unit Operations to the KCC, to the district court, and to our court, Trees argues that the commingled Morrow and Chester formations

do not constitute "a single and separate natural reservoir" and that the Commission erred in its interpretation of the statute and must be reversed.

The Commission and the district court refused to apply what each deemed to be Trees' "narrow" interpretation in the face of establishing a unit that would allow recovery of substantial additional production, prevent unnecessary waste, and protect correlative rights of the parties. We have previously set forth the findings of the Commission and district court which in effect hold that the "pool" definition more properly encompasses a single pressure system where production from one part of the pool affects the reservoir pressure throughout the pool.

This issue brings into focus numerous rules of statutory construction whose applications could give rise to different results. The Commission most strongly relies on the statement from *Todd v. Kelly*, 251 Kan. 512, 516, 837 P.2d 381 (1992):

" 'In order to ascertain the legislative intent, courts are not permitted to consider only a certain isolated part or parts of the act, but are required to consider and construe together all parts *in pari materia. When the interpretation of some one section of an act according to the exact and literal import of its words would contravene the manifest purpose of the legislature, the entire act should be construed according to its spirit and reason, disregarding so far as may be necessary the strict letter of the law.'* [Citation omitted.]"

Trees argues that "natural" has a limited meaning that does not justify the expanded definition as found by the Commission because "ordinary words are to be given their ordinary meaning and a statute should not be so read to add that which is not readily found therein as to read out what as a matter of ordinary English is in it. [Citation omitted.]" *GT, Kansas, L.L.C.*, 271 Kan. at 316.

As was said in *Williamson v. City of Hays*, 275 Kan. 300, 305, 64 P.3d 364 (2003): "The fundamental rule of statutory construction to which all other rules are subordinate is that the intent of the legislature governs if that intent can be ascertained. The legislature is presumed to have expressed its intent through the language of the statutory scheme it enacted." In *State ex rel. Morrison v. Oshman Sporting Goods Co. Kansas*, 275 Kan. 763, Syl. ¶ 2, 69

P.3d 1087 (2003), after stating that statutes must be construed to give effect, if possible, to the entire act, it was said:

"To this end it is the duty of the court, as far as practicable, to reconcile the different provisions so as to make them consistent, harmonious, and sensible. The court must give effect to the legislature's intent even though words, phrases, or clauses at some place in the statute must be omitted or inserted."

Because there has been an amendment by the 2004 Kansas Legislature to K.S.A. 55-1302, specifically to the "pool" definition, see L. 2004, ch. 115, sec. 1, we must also look to and consider conflicting maxims which state:

"When the legislature revises an existing law, it is generally presumed that the legislature intended to change the law. *Board of Sedgwick County Comm'rs v. Action Rent to Own, Inc.*, 266 Kan. 293, 304, 969 P.2d 844 (1998). This presumption, however, may be weak according to the circumstances and may be wanting altogether. *Board of Education of U.S.D. 512 v. Vic Regnier Builders, Inc.*, 231 Kan. 731, 736, 648 P.2d 1143 (1982). When a statute is ambiguous, an amendment may indicate a legislative purpose to clarify the ambiguities in the statute rather than to change the law. *State ex rel. Morrison v. Oshman Sporting Goods Co. Kansas*, 275 Kan. 763, 773, 69 P.3d 1087 (2003)." *Hallmark Cards, Inc. v. Kansas Dept. of Commerce & Housing*, 32 Kan. App. 2d 715, 723, 88 P.3d 250 (2004).

It is clear that the Kansas Legislature has intended for the Unitization Act to be construed so that unit operations can be fostered and enhanced. This is shown by the 2000 amendment to reduce the approval requirement from 75 percent to 63 percent (L. 2000, ch. 15, sec. 2), and the 2004 amendment clarifying the pool definition and not requiring Commission approval if all mineral and royalty owners and not less than 90 percent of working interest owners approve in writing the contract for unit operation. (L. 2004, ch. 115, secs. 1 and 3.)

Trees places an unrealistic emphasis on the single word "natural" in the pool definition as defining "reservoir," when consideration of all of the wording of K.S.A. 55-1302 much more logically shows that a pool is to be "characterized by a single pressure system so that production from one part of the pool affects the *reservoir pressure* throughout its extent." [Emphasis added.]

"Natural" is defined in Black's Law Dictionary 1054 (8th ed. 2004) as being "[i]n accord with the regular course of things in the universe and without accidental or purposeful interference." There can be no question but that oil and gas drilling and producing operations have the effect of changing producing formations from their natural state. This, along with our obligation to look to the legislative intent of the Unitization Act and the legislative intent, requires us to look beyond the restrictive interpretation Trees requests.

With the absence of prior Kansas cases on this issue, the most on-point discussion does come from Professor Smith's Kansas Law Review article previously set forth in our summary of both the Commission's order and the district court's decision. A reading of the entire pool definition as well as the adjoining sections of the Kansas Unitization Act clearly support Professor Smith's statement that a "series of vertically separated reservoirs which have been brought into pressure communication through multiple-completion drilling and production techniques would qualify as a 'pool' under the statute and could be developed as a single unit under the Act." 17 Kan. L. Rev. at 137. Smith also correctly notes that such a construction is consistent with the purposes of the Act which are to avoid economic waste and uneconomical methods of production. 17 Kan. L. Rev. at 137. We, like the Commission and the district court, agree with and adopt this construction of the "pool" definition.

Trees correctly argues that the Oklahoma cases cited in the Smith article and district court ruling relate to an Oklahoma statute which defines an area to be unitized as covering a "common source of supply." Okla. Stat. Annot. 52 Oil and Gas § 287.4 (2004) and as defined by Okla. Stat. Annot. 52 Oil and Gas § 86.1(c) (2000). Because of this difference in language, we must discount the precedential value of the two Oklahoma *Jones* cases. However, in doing so, we do point out that K.S.A. 55-1307, which relates to enlargement of unit areas and creation of new units, does state that unit areas may be enlarged to "include adjoining portions of the *same common source of supply.*" [Emphasis added.]

We will not here discuss the Texas cases which were well considered in the district court decision. The fact they are proration cases and their result nullified as authority by later statutory amendments justifies them not being considered as authoritative.

We do agree with all of the observations of both the Commission's order and the district court decision as to the purpose of the Unitization Act, the necessity of reading the entire Act together and not one phrase in isolation, the legislative intent, and the overriding obligation of the Commission to prevent waste, foster economic development, and protect correlative rights. These are clearly reasons which require the affirmance of the Commission's orders.

This then leads us to the final factor that we must consider. After the district court decision in late 2003 was pending on appeal, the 2004 Kansas Legislature enacted House Bill 2652, which amended K.S.A. 55-1302 in the following manner applicable to our case:

"Section 1. K.S.A. 55-1302 is hereby amended to read as follows: 55-1302. *As used in this act:*

. . . .

"*(b)* '*Pool*' *means* an underground accumulation of oil and gas in a ~~single and separate natural reservoir characterized by~~ *one or more natural reservoirs in communication so as to constitute* a single pressure system so that production from one part of the pool affects the ~~reservoir~~ pressure throughout its extent. . . .

. . . .

"*(d)* 'Waste,' in addition to its meaning as used in articles 6 and 7 of chapter 55 of the Kansas Statutes Annotated ~~shall include~~, *and amendments thereto, includes* both economic and physical waste resulting from the development and operation separately of tracts that can best be operated as a unit. . . .

. . . .

"New Sec. 2. The amendment by this act of the definition of 'pool' shall not be considered a statement of legislative intent for the purpose of interpretation of the definition of 'pool' prior to its amendments by this act." L. 2004, ch. 115, secs. 1 and 2.

The arguments of the parties vary. Trees contends the 2004 Legislature intended to change the meaning and intent of the definition of "pool" and points to the testimony of Dr. M. Lee Allison, state geologist, who stated, "The existing law allows only single and separate reservoirs to be unitized." See Minutes, Sen. Comm. on

Utilities, March 10, 2004. Trees argues because of the language of new Section 2, a legislative change was prospectively effected.

The Commission, Chesapeake, and OXY equally persuasively point to the testimony of Edward Cross, executive vice president of Kansas Independent Oil & Gas Association, and E.R. Brewster for BP America, which show the amendment was simply a clarification of legislative intent so there would be no doubt in the future. See Minutes, Sen. Comm. on Utilities, March 10, 2004. They further argue Section 2 was added because the legislature was aware of this case and did not want to adjudicate its outcome.

Anadarko's argument differs and suggests any reference in this case to H.B. 2652 and the amendment to the pool definition "is inappropriate and that such reference, as well as the statute and testimony of conferees . . . should be totally disregarded. . ." There is considerable logic in this argument as new Section 2 states the amendment "shall not be considered a statement of legislative intent."

The sharp conflict this case presents leads to the clear conclusion that we are being asked to resolve language which is clearly ambiguous, at least in the minds of the appellees herein. Trees argues against this conclusion. But, different interpretations of the pool definition lead to different results. This is "an uncertainty of meaning or intention, as in a contractual term or statutory provision," which is how Black's Law Dictionary, 88 (8th ed. 2004) defines ambiguity.

It is more logical to hold that the amendment does nothing more than "clarify the ambiguities in the statute rather than to change the law." *State ex rel. Morrison*, 275 Kan. at 773, which relies on 1A Singer, Statutes and Statutory Construction §22.01 (6th ed. 2002).

We are also taught that statutes are to be construed to avoid unreasonable results. *In re M.R.*, 272 Kan. 1335, 1342, 38 P.3d 694 (2002). If we follow Trees' arguments and deny unitization here because of the "pool" definition, the legal effect of our decision is immediately ineffective. Chesapeake has only to file a new application with the Commission and, assuming the facts remain as previously presented, a unitization order would be expected.

We hold that the 2004 amendment to the "pool" definition contained in H.B. 2652 should either not be considered or, if it is considered, should represent nothing more than a clarification. In either event, it does not change this court's affirmance of the decisions of the Commission and district court insofar as they relate to allowing unit operation of the commingled Chester and Morrow formations as a single pressure system falling within the K.S.A. 55-1302 definition of a "pool."

With this conclusion reached, we move on to Trees' final three issues relating to the Commission's orders which we state positively.

## II. The Commission followed all requirements of the Kansas Unitization Act in including the Trees' acreage in the Unit for which it will be fairly compensated.

Trees argues that the unit participation factors or percentages assigned to it do not fairly and equitably value Trees' acreage. It further contends its minority interests were not adequately protected. As the result of these alleged injustices, the KCC unitization order amounts to an unconstitutional taking of Trees' property. It further contends it is being compelled to take business risks it cannot control and does not want to take.

What this actually boils down to is whether the KCC's finding that the Unit Operating Agreement was fair and equitable was supported by substantial competent evidence. See K.S.A. 77-621(c)(7) and (8). The district court found these findings were supported by substantial competent evidence, that the order was not in any way arbitrary or capricious, and that Trees had failed to show that it was in any way treated unequally.

The Commission's orders are not in any way a "taking" as Trees argues. K.S.A. 2003 Supp. 55-1304 and K.S.A. 2003 Supp. 55-1305 set out in detail the findings that must be made and the provisions required in the unitization and unit operation order. There is clearly legislative authority for the Commission's actions, and all of the statutory requirements were followed.

Trees' argument that the technical committee used outdated production data is based on its late April 2001 fracture treatment

of the Josephine well which resulted in higher recent production. The Unit Operating Agreement divides participation into two phases. Phase I weighs current production during December 1999 through May 2000, along with remaining recoverable primary reserves. Trees argues that had late term production been used, it would have received a higher level of unit production.

The KCC order found that the data had to be cut off at some point and computations could not deal with a "constantly moving target." The order pointed out the fracture treatment did not take place until after notice of the intended unit was known and the formulas for the proposed unit had been discussed. The Commission recognized that fracture treatment resulted in a temporary increase in production but noted that a well then returns to its original decline. It was held to have been extremely difficult and possibly improper to use the enhanced production in the computations.

There was substantial competent evidence to support the Commission's order approving the use of the prior data. The formula was fair and equitable, and the Commission's order in approving it was not arbitrary or capricious.

There was clearly sufficient evidence to sustain the use of Morrow formation production in the Unit even though Trees' acreage was currently unproductive in the Morrow. There was expert testimony of the commingling of the Morrow and Chester formations and that additional Morrow production could be anticipated in which Trees would share. While significant amounts of Morrow production would not be expected from the waterflood, it was prudent to leave the formations open and unnecessary cost and waste would result from closing the Morrow. A review of the record shows substantial competent evidence supports the KCC's findings relating to the Morrow formation.

Trees' arguments concerning the usage of the estimated Chester hydrocarbon pore volume (HPV) factor are not persuasive. Gowens' testimony explained this usage, and it was not refuted. Even Hupp acknowledged he had previously advocated the use of HPV before the Commission. The geology may not be constant and the formula may not be perfect, but it was fairly and logically devel-

oped, supported by substantial competent evidence, and its adoption by the KCC was clearly justified.

Trees' argument that its minority interest was not adequately protected is without merit. The Commission ordered a second hearing to satisfy itself precisely on this point. The testimony of Professor Pierce of the Washburn Law School was unchallenged. He said the agreements satisfied all statutory requirements, were fair and equitable in following industry standards, and adequately protected interests of unwilling minority participants. Trees offered no changes or improvement. The small issue of property valuation became a nonissue with control remaining in Trees, and the tank battery usage it questioned remained under its control and usage. There was clearly substantial competent evidence that the Unit Operating Agreement was fair and equitable.

Testimony showed that including Trees' acreage in the Unit increases its value from approximately $130,000 to $390,000 based on testimony before the KCC. The present net worth of the acreage increases approximately $250,000. Trees will share in the expected $6.2 million profit from the Unit. Trees might lose absolute control of its property, which is statutorily allowed, but it will benefit economically from being in the Unit.

We have examined all of Trees' arguments, whether responded to in detail or not, and none satisfy its burden of showing improper or unlawful agency action. There was substantial competent evidence for all of the Commission's findings and orders, and none were arbitrarily or capriciously made.

### III. Inclusion of the Trees' tracts in the South Eubank Unit was clearly supported by substantial competent evidence.

The standard of review of this contention is under K.S.A. 77-621(c)(7) under which an agency's findings of fact must be "supported by the evidence that is substantial when viewed in light of the record as a whole."

Trees' main contention is that Chesapeake failed to provide "tangible evidence" of pressure communication between Trees' acreage and the other portions of the proposed unit. Trees claims drill

stem tests should have been submitted to support Chesapeake's contention of pressure communication of the Chester sand throughout the Unit. This contention is not persuasive based on the evidence submitted to the KCC through various studies and expert testimony.

Gowens and Scott both opined that the whole Unit, including the Trees' tracts, were in the same reservoir and were pressure connected. Gowens testified as to how the Unit boundaries were established by the technical committee. Gowens specifically stated the southern boundary of the reservoir was an oil-water contact at the subsea datum of 2515 identified at the Trees' Josephine well.

Scott testified the unit area including the Trees' acreage was an excellent waterflood candidate because it is in good pressure communication. Even Trees' witness Hupp conceded there was pressure communication between the Trees' Josephine 1-15 well and the balance of the Unit.

Scott further testified that exclusion of the Trees' tracts and Josephine well from the Unit would violate correlative rights. Correlative rights, as defined in K.A.R. 82-3-101(21) means

"the privilege of each owner or producer in a common source of supply to produce from that supply only in a manner or amount that will not have any of the following effects:
(A) Injure the reservoir to the detriment of others; or
(B) take an undue proportion of the obtainable oil and gas; or
(C) cause undue drainage between developed leases."

This definition was cited and approved in *Southwest Kan. Royalty Owners Ass'n v. Kansas Corporation Comm'n*, 244 Kan. 157, 183, 769 P.2d 1 (1989). Scott opined that if the Josephine well were allowed to remain a producer outside the Unit, there would be a migration of oil from the Unit of as much as 18,000 barrels which would violate the correlative rights of the other owners within the Unit. Scott described this increase in Josephine production as a "certainty."

Trees' expert Pronold testified there was a significant degree of lateral compartmentalization within the Eubank Unit which resulted in pressure communication making a flood risky. Gowen testified the article Pronold relied on described only sections at the

north boundaries of the Unit and that no such compartmentalization existed in the rest of the Unit.

Trees' disagreement with Gowens' and Scott's testimony is not sufficient to establish substantial competent evidence does not exist. This is in fact the very evidence the Commission relied on as is previously stated herein in summarizing its order.

There was substantial competent evidence to support the Commission's findings that the Eubank Unit should include the Trees' tracts because there was pressure communication with the rest of the Unit. There was further evidence that the Commission properly protected correlative rights by requiring the Trees' tracts to be included in the Unit. The Commission is obligated to resolve conflicts of the experts' opinions. See *Suburban Medical Center v. Olathe Community Hosp.*, 226 Kan. 320, 330-32, 597 P.2d 654 (1979).

There was substantial competent evidence to support the Commission's findings, and Trees has failed in its obligations to show to the contrary as is required under the KJRA.

## IV. The KCC did not err in denying Trees' motion to present supplemental technical testimony at the April 2, 2002, hearing.

Our scope of review of this issue is set forth in K.S.A. 77-621(c)(8), which requires us to find the "agency action is otherwise unreasonable, arbitrary or capricious."

The Commission, in an abundance of caution, was concerned about the fairness to Trees of the Unit Operating Agreement. The Interim Order which was issued on March 12, 2002, specifically stated: "The Commission has before it ample record and is ready to rule on the conditions in K.S.A. 55-1304(a) and (b)."

The Commission's order specifically stated: "[T]he record should be reopened for the specific purpose of receiving explanation or argument as to whether the specific terms of the Unit Operating Agreement are fair and equitable to all parties and to take additional evidence on that issue."

Despite this clear statement, Trees, on March 25, 2002, filed a motion seeking to introduce supplemental geological and engi-

neering evidence at the April 2, 2002, hearing. The Commission correctly refused to allow this additional technical evidence.

Trees' argument that it was somehow denied due process by the Commission's Interim Order is not persuasive. Trees points to the limited time to prepare for the September 2001 hearing. However, it had early knowledge of the studies of the proposed unit through its representatives' attendance of early technical meetings. It had knowledge of the proposed unit with its inclusion by May 16, 2001.

The initial filing before the Commission on June 27, 2001, was 85 days before the hearing was held.

Virtually, all the data relied on in the supplemental testimony was available before the September 20, 2001, hearing. The data to prepare the 2-D seismic study was done in July 1997 and was available long before Trees finally studied it in March 2002. The Trees' experts, Hupp and Pronold, were hired 6 weeks before the initial hearing.

Allowance of supplemental technical evidence would in effect allow Trees a second chance to retry the case. It would have forced the applicants to prepare rebuttal testimony. The Commission found that Trees' belief that it could not be included in the Unit was an erroneous conclusion of Trees' own making.

The Commission, as the trier of fact, must be given wide latitude and discretion in establishing time limits and admitting evidence. Trees was given several extensions of the initial hearing date, and the denial of Trees' request is not unreasonable, arbitrary, or capricious.

Affirmed.

LUCKERT, J., dissenting: I dissent from the majority's interpretation of K.S.A. 55-1302 which, in effect, deletes the word "natural" from the definition as written by the legislature. The legislature clearly and unambiguously restricted the definition to single and separate natural reservoirs stating: "The term 'pool' as herein used shall mean an underground accumulation of oil and gas in a single and separate *natural* reservoir characterized by a single pressure system so that production from one part of the pool affects the

reservoir pressure throughout its extent." (Emphasis added.) K.S.A. 55-1302.

In essence, the majority concludes that the legislature did not mean to use the phrase "single and separate *natural* reservoir," at least as the phrase would ordinarily be understood, because restricting application of the unitization statutes to only single and separate natural reservoirs eliminates coverage from the unitization statutes for those reservoirs, such as the ones at issue, where pressure communication resulted from multiple drilling and production operations. Therefore, the majority concludes that what the legislature meant to say is that a pool is to be characterized by a single pressure system and it does not matter whether this single pressure system is a naturally occurring single and separate reservoir or is the result of multiple-completion drilling and production techniques. The majority rationalizes that its reading is consistent with legislative intent and the Kansas Corporation Commission's (KCC) obligation to prevent waste, foster economic development, and protect correlative rights.

However, the majority's interpretation ignores one of the most basic rules of statutory construction:

"The legislature is presumed to have expressed its intent through the language of the statutory scheme it enacted. When a statute is plain and unambiguous, the court must give effect to the intention of the legislature *as expressed* rather than determine what the law should or should not be. [Citation omitted]." (Emphasis added.) *Williamson v. City of Hays*, 275 Kan. 300, 305, 64 P.3d 364 (2003).

Stated another way, it is inappropriate for this court or the KCC to delete a word or phrase from a statute if doing so would rewrite an unambiguous statute. As written, K.S.A. 55-1302 is unambiguous. As written, K.S.A. 55-1302 need not be reconciled with other statutory provisions; it simply gives other provisions a narrower application. Furthermore, as written, K.S.A. 55-1302 advances the legislative goals, albeit in a manner limited to natural reservoirs. The majority's interpretation gives a wider application and may maximize the opportunities to apply the unitization statutes. However, the court's role is not to rewrite the statute to a version which the court perceives as maximizing the legislative goals; the court's role is to apply an unambiguous statute as written. To do otherwise

interferes with the policy decision made by the legislature, which in this case was clearly to limit the coverage of unitization provisions to oil and gas accumulations in a single and separate natural reservoir.

In essence, the majority's holding reaches the same result as the 2004 amendments which, as stated in the Supplemental Note on H.B. 2652 (2004), "change" and "expand the definition" of the term "pool." Similarly, the majority's interpretation of K.S.A. 55-1302 is a change and expansion of the unambiguous definition provided by the legislature. As such it is inaccurate to cast the majority's interpretation as a clarification or reconciliation, terms which the majority uses to justify its position.

As further justification for its analysis, the majority cites Professor Ernest E. Smith's article, Smith, *The Kansas Unitization Statute: Part II*, 17 Kan. L. Rev. 133 (1968). Professor Smith reaches his conclusion based upon case law which interprets the Oklahoma statute to apply to any accumulations of oil and gas separated by a strata of earth but connected by common well bores and his belief that the purposes of the Kansas Unitization Act are better fulfilled if applied to "a series of vertically separated reservoirs which have been brought into pressure communication through multiple-completion drilling and production techniques." 17 Kan. L. Rev. at 137. The majority recognizes that because of the differences in the Oklahoma and Kansas statutes, the Oklahoma authorities have little precedential value. However, the majority seemingly accepts Professor Smith's argument that a *natural* result of drilling may be to place two separate formations in pressure communication and such a result must have been what the legislature meant to address.

While this may be what Professor Smith, the appellees, the KCC, and the majority wish the statute said, it is clearly not what the statute provides. "Ordinary words are to be given their ordinary meaning, and a statute should not be so read as to add that which is not readily found therein or to read out what as a matter of ordinary English language is in it. [Citation omitted.]" *GT, Kansas, L.L.C. v. Riley County Register of Deeds*, 271 Kan. 311, 316, 22 P.3d 600 (2001). The majority, citing Black's Law Dictionary 1054 (8th ed. 2004) recognizes the ordinary definition of "natural": "In

accord with the regular course of things in the universe and without accidental or purposeful interference." However, the majority does not apply this ordinary meaning to the facts of this case. Well-bore drilling is an act of purposeful interference. The unitization provisions do not apply to separate reservoirs commingled by purposeful interference. K.S.A. 55-1302 limits the definition of "pool" to natural reservoirs.

K.S.A. 55-1302 is plain and unambiguous; therefore, this court should give effect to the intention of the legislature as expressed rather than determine what the law should or should not be. Under the clear and unambiguous language of the statute, Trees' property should not be included in the unit and the remaining issues should be treated as moot.

ALLEGRUCCI and BEIER, JJ., join the foregoing dissenting opinion.